## Case No. 12,111.

RUDDY et al. v. The GOLDEN STATE.

[Hoff. Op. 477.]

District Court, N. D. California. April 21, 1861.

SEAMEN—WAGES—FORFEITURE—DAMAGES.

[1. Absence from the ship without leave for two hours is not desertion or misconduct meriting a forfeiture of wages.]

[2. Seamen discharged for slight misconduct and a declaration that they would not continue the voyage can recover no damages beyond their wages for the time of their actual service.]

[This was a libel by George Ruddy and others against the schooner Golden State for seamen's wages.]

E. Bartlett, for libellant.
W. A. Cornwall, for claimant.

HOFFMAN, District Judge. The libellants were shipped at this port for a voyage to Humboldt Bay, thence to Tahiti, and back to this port, at the rate of $20 per month. The vessel proceeded to Humboldt Bay, took in a cargo, and sailed for Tahiti, but was obliged to put into this port to repair damages by stress of location. A few days after her arrival, the men who had continued on board were put ashore by a police officer, acting under the captain's orders. They now claim their wages and damages for the breach of contract. The defence set up is forfeiture by desertion. The log-book is not produced, nor is it pretended that the men were at any time absent without leave for forty-eight hours. which, by the statute, constitutes a desertion involving the forfeiture of wages. They appear to have gone ashore for a few hours, in the early part of the evening, on one or two occasions, but it does not seem that this breach of discipline was considered of sufficient consequence to be noted in the log-book. The only testimony which tends to show that the men refused to continue the voyage is that of Captain Crandell. This witness swears that he was on the vessel dining with the captain, when the men came off. They had gone ashore about 10 o'clock, to get their dinner. They complained that the dinner served to them was not fit to be eaten. They returned between 12 and 1 o'clock. The captain, after some conversation with regard to the dinner, asked them if they would continue the voyage, to which they replied that they would not; nothing further occurred. The men remained on board; the captain went ashore,

shipped another crew, and having procured a police officer, caused the men to be turned out of the vessel. These circumstances are relied on by the claimants as constituting a desertion and forfeiture of wages. It is almost unnecessary to say that they are wholly insufficient for that purpose. The men are therefore entitled to their wages. Whether or not they would be entitled to damages for their discharge depends on two questions. First. Was the discharge with their own consent? Secondly. Have they sustained any damage?

It would seem from the testimony of Capt. Crandell, that one of the men, acting probably as the spokesman of two others, positively declined to continue the voyage. It is also stated by the mate, that the libellant Geo. Ruddy, applied to the master for his discharge but was refused. It appears that when the men were originally shipped, they were indebted to their boarding-house keeper. As no advance wages were given, this person made out his bills against each of them, and procured from the master an agreement to pay their amount out of the wages which should be due the men on the return of the vessel from Tahiti. It is testified by the mate, that the boarding master, Laflin, was in consultation with the crew while the vessel lay in this port, after her return from Humboldt Bay; and it is quite probable that, being impatient for his money, he instigated the men to ask for their discharge and their wages, in order that they might be able to repay their indebtedness to him. However this may be, the proofs, I think, show that the men were quite willing to be discharged on receiving the wages due them; and, even if discharged against their will, their insubordinate conduct in going ashore on two occasions, at night, and without leave, was such as to forfeit any claim to damages, had any been proved. It does not appear that there was any difficulty in obtaining employment on another vessel for at least as high wages as those agreed to be given them, nor has any proof whatever been offered as to damages sustained by reason of the discharge.

If, however, I were satisfied that the dismissal of the men was tortious, and a wholly unjustifiable abandonment of the contract by the master, I should have no hesitation in decreeing to the men wages for the voyage from this port to Humboldt Bay and back, at the usual rate given on such voyages, viz. $30 per month, and not at the rate at which they shipped for the much longer voyage agreed to be performed. But, as before observed, I think it tolerably evident that the conduct and language of the men were such as to lead the master to the honest belief that they did not wish or intend to continue the voyage, and that he had no alternative but to ship another crew. Had he distinctly inquired of the crew what their intentions were, and at the same time informed them that

their refusal to perform the voyage would be insisted on as a forfeiture of their wages, and had the crew deliberately refused to do their duty, they could not have recovered in this action. But the inquiry made by the master, as testified by Capt. Crandell, was only addressed to three of the men, and only replied to by one, and it may very possibly have been understood by them as intended to ascertain their wishes, rather than as a peremptory demand upon them to continue the discharge of their duty, a refusal to comply with which would forfeit all antecedently earned wages. It does not appear that, up to that time, the men had refused to perform the usual duties of seamen on board a vessel in the harbor, nor was any opportunity for repentance and return to duty afforded, when they were summarily turned out of the vessel by the police officer. I think, on the whole, that they should have their wages at $20 per month for the time of their actual service.

It is objected that the master has signed the bills to the boarding house keeper, to which the men assented, and that, therefore, they cannot recover any wages until the return of the vessel from Tahiti. But this arrangement was made under and with reference to the original contract. If that has been abandoned by both parties, a fortiori, if the men, by the act of the master, have been prevented from fulfilling it, the wages earned become presently payable. Besides, these bills, with the master's endorsement, are produced by the libellants and offered to be surrendered. All difficulty or doubt in the matter is thus obviated. A decree must be entered in favor of each of the libellants for the wages due him, at the rate of $20 per month.